IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT F.,[1] | ) |
| | ) |
|     Plaintiff, | ) |
| | )   No. 19 C 8078 |
| v. | ) |
| | )   Magistrate Judge Gabriel A. Fuentes |
| KILOLO KIJAKAZI, Acting | ) |
| Commissioner of Social Security,[2] | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[3]

Before the Court are Plaintiff Robert F.'s motion to remand the Administrative Law Judge's ("ALJ") October 16, 2018 opinion denying his application for Social Security disability benefits[4] (D.E. 12) and the Commissioner's cross motion to affirm the opinion. (D.E. 20.)

---

[1] The Court in this opinion is referring to Plaintiff by his first name and first initial of his last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id*. A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id*., citing *Doe v. Blue Cross & Blue Shield United of Wis*., 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court abides by IOP 22 subject to the Court's stated concerns.

[2] The Court substitutes Kilolo Kijakazi for her predecessor, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[3] On January 27, 2020, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was reassigned to this Court for all proceedings, including entry of final judgment. (D.E. 8.)

[4] The Appeals Council ("AC") subsequently denied review of the opinion (R. 1-6), making the ALJ's decision the final decision of the Commissioner. *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021).

I.     **Background**

Plaintiff was born on September 13, 1967 and applied for disability insurance benefits ("DIB") on July 7, 2016, alleging that he became disabled on February 29, 2016 because of depression, anxiety, "frozen" shoulder, diabetes, right foot blood blister, and kidney, heart, and blood pressure problems related to his diabetes. (R. 20, 22, 32, 67.)[5]

Plaintiff visited the emergency room on February 29, 2016 complaining of increasing depression over the previous two weeks and suicidal thoughts, reporting that until then, his primary care doctor had managed his depression and that he had taken the anti-depressant Prozac for several years. After spending the night in the emergency room, Plaintiff was hospitalized in the psychiatric unit from March 1 to March 4, 2016. (R. 288.) He was diagnosed with depression and started on the anti-depressant Lexapro and a sleeping pill. (*Id.*) At discharge, Plaintiff reported feeling somewhat more relaxed and ready to put in the effort to feel better. (R. 293.) He began having regular appointments with the psychiatrist who first saw him in the hospital, Dr. Sandeep Goankar, and a therapist on an outpatient basis. (R. 449-71, 1000-1010.)

Plaintiff complained intermittently of shoulder and foot pain. (R. 980-87, 991.) On March 7, 2016, he had an MRI on his shoulder which revealed a torn labrum. (852-53.) In mid-May 2016 he underwent a physical examination in preparation for foot surgery; examination results were normal except for problems with his right toe and the notation that he had a mild hand tremor. (R. 891-92). On May 20, 2016 Plaintiff underwent arthroplasty (joint replacement) of the second toe of his right foot because of "hammertoe." (R. 430, 866.) Around the same time, he was also

---

[5] The administrative record contains more than 500 pages of medical records starting in 2006 from Plaintiff's regular doctors' appointments with endocrinologists, eye doctors, and his primary care physician, Richard Rivers, M.D for treatment of and medication management for various medical issues including diabetes and high blood pressure. (R. 476-944.) Most of the medical records are not relevant to our ultimate decision and will only be discussed as necessary.

2

diagnosed with right shoulder adhesive capsulitis or "frozen shoulder." (R. 444.) In early August 2016 he reported increasing depression and suicidal ideation in part because of financial stressors and his inability to work because of his physical issues; Dr. Goankar added the medication Rexulti, which is a "helper medication" used in conjunction with other anti-anxiety drugs, which helped Plaintiff's symptoms. (R. 449.) Plaintiff continued to complain to his therapist of depression related to financial stressors but fewer suicidal thoughts. (R. 451-453.)

Plaintiff underwent joint release surgery on his right shoulder on August 24, 2016. (R. 913.) The medical record contains little evidence regarding the results of procedure, although at a consultative examination on September 13, 2016 as part of Plaintiff's claim for benefits, Rafiq Muhammed, M.D., found normal range of motion and grip strength and an otherwise mostly normal physical examination other than mild difficulty with heel-toe walking. (R. 955, 957.) At this examination, Plaintiff reported that he had attempted suicide in the past, had mood swings, anger issues, and wanted to stay away from people. (*Id.*) He complained of being forgetful and unfocused and told the doctor that he could walk up to one mile at a time, stand for 15 minutes and sit for an hour (*Id.*, 956.)

On September 15, 2016, Plaintiff had the second toe on his right foot amputated because it had become painful and swollen around the previously replaced joint. (R. 1030-36, 1043.) He returned to his mental health therapist on October 7, 2016 continuing to complain of anxiety and depression primarily related to financial stress but reporting that he was coping adequately with his stressors. (R. 455.)

Throughout 2017, Plaintiff continued to have regular appointments with his endocrinologist, psychiatrist, internist, therapist, and other doctors as needed for follow-up appointments and medication management. (*See, e.g.,* R. 1172-1257.) The next medical evidence

3

concerning a change in Plaintiff's impairments is from January 23, 2018 when Dr. Gaonkar noted masked facies (lack of change in facial expression) and stiff-armed gait and referred Plaintiff to a neurologist to test for possible Parkinson's disease. (R. 1693.) On February 27, 2018 Dr. Rivers noted that Plaintiff had hand tremors of varying intensity and that he was being referred to a neurologist. (R. 1610-11.) On March 5, 2018, Plaintiff reported continued difficulties with his mood and Dr. Gaonkar ordered Plaintiff to continue taking his present medications and added Cymbalta. (R. 1694.) After an MRI and evaluation, on April 18, 2018, neurologist Kishore Santwani, M.D. concluded that Plaintiff's tremors were a side effect of his medications. (R. 1686.)

The medical record also contains several medical opinions. On April 16, 2016, Dr. Gaonkar completed a medical opinion as part of Plaintiff's claim for short-term disability that he had initially filed after his hospitalization for depression. (R. 964.) Dr Gaonkar wrote that he had advised Plaintiff to stay out of work "indefinitely" because of his severe depression and anxiety coupled with his diabetic neuropathy and upcoming surgeries on his toe and shoulder, and that Plaintiff was unable to start his day or initiate and focus on work due to his mental impairments. (*Id.,* 965.) Dr. Gaonkar opined that Plaintiff might be able to return to work in a more sedentary job if his anxiety and depression "come under control." (R. 966.)

Dr. Gaonkar next completed a mental health RFC on September 2, 2016, stating that he had seen Plaintiff monthly since March 1, 2016. (R. 472.) Dr. Gaonkar diagnosed Plaintiff with major depression and noted that he had suicidal thoughts. (*Id.*) He opined that Plaintiff was unable to concentrate for a "long time" and that his extreme depression and anxiety would prevent him from focusing or concentrating at work. (R. 475.)

On November 7, 2016, a non-examining agency psychologist opined that Plaintiff had mild restrictions in his activities of daily living and ability to maintain social functioning and moderate

4

difficulties in maintaining concentration, persistence and pace. (R. 70, 71.) The psychologist, Dr. Voss, Ph.D., reviewed Plaintiff's medical file going back to his hospitalization for depression in March 2016, including evidence of his activities of daily living ("ADLs"), his treatment records, and Dr. Gaonkar's opinions, and determined that Plaintiff would be able to maintain a regular work schedule and engage in tasks that were more than simple but less than complex. (R. 77-78.) Charles Kenney, M.D., reviewed the medical record with respect to Plaintiff's physical impairments, including the consultative examination that found Plaintiff to have a normal range of motion in all extremities, and opined that Plaintiff's physical RFC allowed him to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk and/or sit up to six hours in an eight-hour workday and that his ability to push and pull with his upper extremities was limited. (R. 74-77.)

On reconsideration by two more non-examining Agency doctors on January 24, 2017, the medical evidence was amended to include the fact that Plaintiff had his second toe amputated on September 15, 2016. (R. 83.) Nevertheless, both of the previous RFC opinions were upheld. (R. 91-96.)

On February 20, 2018, Dr, Rivers completed an opinion that due to Plaintiff's diabetes, anxiety, depression, and tremors, he could sit, stand, or walk for four to six hours in an eight-hour workday, lift up to 20 pounds occasionally and ten pounds frequently, occasionally reach with either arm and was unable to engage in fine manipulation with either hand and could not engage in gross manipulation with his right hand. (R. 1430-31.) Dr. Rivers also checked a box agreeing that Plaintiff's medication side effects would interfere with his ability to work (although he did not specify what those side effects were or what medication was at fault) and that he would also need two-to-four breaks per workday to care for his diabetes but did not say what care was required. (R. 1432.) On March 13, 2018, Dr. Rivers completed another medical opinion in conjunction with

5

Plaintiff's continuing request for short-term disability that opined Plaintiff would be unable to lift over 50 pounds, had limited vision because of diabetic changes to his eyes, was limited in his ability to perform fine motor skills because of his hand tremors, and had anxiety and depression that limited his ability to work. (R. 1628.)

On March 5, 2018, Dr. Gaonkar completed another opinion diagnosing Plaintiff with "major depression." (R. 1434.) He opined Plaintiff was markedly limited in all areas of using and remembering information and concentrating, persisting, and maintaining pace, and that his inability to engage in social interaction and adapt and show ability to manage oneself ranged from moderate to marked. (R. 1435-36.) Dr. Gaonkar listed Plaintiff's symptoms as low energy, low concentration, severe depression and marked psychomotor slowing. (R. 1437.)

## II. Hearing Testimony

At the hearing, Plaintiff testified that he sometimes experienced pain in his feet when he stood for a long time, and that he does not experience pain in his shoulder during the day since having release surgery, although it sometimes hurt at night when he slept on it. (R. 48-49.) During the hearing, the ALJ noted that Plaintiff's right hand was trembling; he explained that he was diagnosed with tremors in January 2018 and was going to be evaluated for Parkinson's. (R. 49.) He experienced low self-esteem and crying spells several times per week, particularly when experiencing low blood sugar; he testified that he had experienced problems with low blood sugar since 1985 when he was first diagnosed with diabetes, which he treats with insulin. (R. 47, 50-51.) When he experiences low blood sugar, Plaintiff testified that he takes a glucose tablet or drinks some juice. (R. 51.) He experiences low blood sugar four or five times per week and it takes about 20 minutes until he feels back to normal. (R. 58).

6

Plaintiff also testified that he can walk for a mile before his feet start hurting and he has to stop, can stand in place for 15 or 20 minutes at one time, and can sit for an hour before he has to stand up. (*Id.*) He can lift just under 20 pounds and has no difficulty climbing stairs, bending, stooping, crouching, crawling, or kneeling. (R. 51-52.) He has no difficulty reaching with either arm or with using his hands, with the exception of having trouble taking his insulin shots in the morning because his fingers shake, which he testified began in January 2018. (R. 52.) Plaintiff stated that he usually drives twice per day, can make a bed, shovel snow, vacuum, dust, mop, sweep, garden, go to the movies, go shopping, read magazines, watch television, feed and walk his dogs, send texts on his cell phone, check his email, and take care of his adult son with autism, who lived with him and his wife. (R. 55-57.)

With respect to his depression, Plaintiff testified that in February 2016 he had three different bosses at his warehouse job ask him to do different tasks at the same time, and that that "flipped a switch" in him that made him want to commit suicide. (R. 59.) On questioning from his attorney, he stated that since then, it felt like his depression had gotten worse even though he took medication. (*Id.*)

A vocational expert ("VE") also testified at the hearing, stating that Plaintiff's former past relevant work was a composite occupation that included forklift driver, inventory clerk, and order picker which were all semi-skilled or unskilled and a medium exertion level according to the Dictionary of Occupational Titles but performed at the heavy exertional level as described by Plaintiff. (R. 61.) The ALJ asked a hypothetical that matched the RFC she eventually assigned Plaintiff, and the VE testified that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (R. 62-63.) When the ALJ altered the hypothetical to add that the individual could use their hands no more than frequently to handle, finger, and feel, the

7

VE testified that several of the jobs - inspector and marker - remained available and she changed the job of assembler of small parts to assembler of molded optical frames. (R. 63.)

### III.     ALJ Opinion

On October 16, 2018, the ALJ issued an order that Plaintiff was not disabled and denying his claim for benefits. (R. 17-39.) In doing so, the ALJ underwent the five-step process for determining disability (20 CFR 404.1520(a)), finding Plaintiff had the severe impairments of history of right shoulder disorder, obesity, and depression. (R. 22.) The ALJ found that several other of Plaintiff's conditions did not result in functional limitations lasting at least 12 continuous months and thus were non-severe, including cellulitis, tremors, diabetes, dysplidemia (high cholesterol), hypertension, and status-post right toe amputation as well as right toe and right foot surgery. (R. 22-23.) Additionally, at Step Three, the ALJ found that none of Plaintiff's impairments met a Listing. (R. 24-25.) In coming to this conclusion, the ALJ undertook the "Paragraph B" analysis to determine that Plaintiff's mental impairments did not rise to Listing level. (R. 25.) Specifically, the ALJ found that Plaintiff had no more than a mild limitation in understanding, remembering or applying information, moderate limitations in his ability to interact with others, moderate limitations in concentration, persistence, and pace, and no more than mild limitations in his ability to adapt and manage himself. (R. 25-26.)

The ALJ then set Plaintiff's residual functional capacity ("RFC") as being able to perform "light work involving: understanding, remembering, and carrying out no more than simple routine tasks where the same tasks are performed day in and day out with no public contact and no more than occasional contact with coworkers and supervisors; no more than frequent use of the upper extremities for pushing/pulling, no more than frequent use of the hands to handle, feel, or finger; no more than occasional: climbing of ramps and stairs, balancing, stooping, crouching, kneeling,

8

crawling, bending, twisting or reaching overhead with the right upper extremity; in a work environment exclusive of: any requirements for climbing ladders, ropes, or scaffolding and strict production quotas or monitoring such that someone would be checking up on the claimant to make sure he is on pace with a set goal, quota or with other employees but is able to be in a work environment permissive of performance being measured by what is completed by the end of the workday." (R. 26.)

In making her RFC determination, the ALJ acknowledged Plaintiff's testimony about foot pain, right shoulder pain, and tremors, that he gets shaky 4-5 times per week because of low blood sugar, and his right toe amputation, as well as his testimony that he could not stand for longer than 15-25 minutes or sit for more than an hour due to circulation problems. (R. 27.) The ALJ also noted that Plaintiff stated that he has difficulty concentrating and experiences crying spells several times per week. (*Id.*) Further, the ALJ discussed that Plaintiff additionally testified to being able to lift just under 20 pounds, that he drives twice per day, visited Universal Studios in Florida, performs household chores including shoveling, vacuuming, dusting, mopping, sweeping, and gardening, and that he watches television, reads magazines, and collects stamps. (*Id.*)

The ALJ discussed a number of medical records concerning both Plaintiff's physical and mental impairments, including:

Physical Impairments

- Diagnosis of right shoulder adhesive capsulitis without numbness or tingling in March 2016;

- Right shoulder arthroscopic release in August 2016;

- September 30, 2016 report that he was doing well post-surgery;

- Improved right upper extremity range of motion and normal motor strength and sensation in October 2016;

- Normal right upper extremity examination in January 2017 and no signs of crepitus;

- April 2018 physical examination with an endocrinologist showing normal motor strength, sensation, range of motion and reflex testing; (R. 27.)

Mental Impairments

- Emergency Room visit for complaints of depression on February 29, 2016 resulting in a three-day inpatient stay, along with notes that Plaintiff improved rapidly with treatment;

- Therapist and counseling records primarily reflecting physical and situational complaints such as financial stress;

- March 7, 2016 assessment of having intact memory, good judgment and insight, and ability to concentrate;

- Plaintiff's report to consultative examiner in September 2016 that his activities included driving and going shopping;

- October 2016 report to therapist that he enjoyed gardening and was thinking about doing volunteer work and a medication management treatment report from the same time period showing Plaintiff doing well;

- December 2016 and February 2017 medication management appointments that described him as doing well and reporting that medication controlled his symptoms;

- June 2017 progress notes reporting Plaintiff was increasing his gardening, exercising, and going out for breakfast;

- September 2017 report to his therapist that he was feeling less depressed and keeping busy with gardening;

- March 2018 report to his therapist that he had improved his relationship with his father, was doing more gardening, and trying to get out of the house more. (R. 28.)

In light of these medical records and in consideration of Plaintiff's testimony, the ALJ concluded that Plaintiff's complaints about the severity of his symptoms were not entirely credible. (R. 28.) The ALJ next discussed and assigned weight (or no weight) to 19 different medical opinions, medical source statements, and other records purporting to document Plaintiff's

10

limitations and/or ability to work or need to take time off of work. As relevant to our analysis,[6] the ALJ gave no weight to Dr. Goankar's April 2016 opinion, which had been completed as part of Plaintiff's claim for short term disability benefits, because "Agency criteria for determining disability were not used and [the opinion] did not provide for specific functional limitations." (R. 29.) The ALJ gave Dr. Goankar's September 2016 opinion little weight because it did not refer to supporting treatment records and the assessed limitations were not consistent with the Plaintiff's ability to engage in a wide variety of activities including driving, handling funds, and caring for himself. (*Id.*)

Next, the ALJ gave some weight to the State Agency consultants' opinions that Plaintiff could perform light work and had at most moderate limitations in the Paragraph B mental health criteria, but the ALJ noted that she was adding restrictions to account for Plaintiff's obesity and upper right extremity disorder and other disorders/symptoms. (R. 29.)

The ALJ gave little weight to Dr. Rivers' RFC opinion from February 20, 2018, because it did not explain or refer to the record to support the limitations cited, including the complete ban on fingering, and the record suggests that Plaintiff's tremors were related to medication and would not last at least 12 months. (R. 30-31.) The March 5, 2018 mental health evaluation by Dr. Gaonkar was entitled to little weight because it did not refer to supporting treatment records and was inconsistent with limitations documented in the record. Moreover, the ALJ noted that the extreme limitations in the opinion were belied by Plaintiff's ability to go out on his own, handle funds, drive his child places daily, go out to eat and visit an amusement park. (R. 31.)

The ALJ also gave little weight to Dr. Rivers' March 13, 2018 opinion because although it was consistent with Plaintiff's lifting limitation, Dr. Rivers did not refer to supporting treatment

---

[6] We are describing only those medical opinions that are from one of Plaintiff's treating doctors or an Agency doctor, or that Plaintiff specifically mentions in his brief as part of his argument in favor of remand.

11

records and did not set forth any actual limitations due to Plaintiff's vision disorder and did not explain the actual impact on claimant's functioning due to his asserted limitations from anxiety or his limited ability for fine dexterity. (R. 31.) In particular, the ALJ pointed to Plaintiff's admission that he could use his hands for fine manipulation and reaching, that he could drive, operate laundry machines, use utensils to eat, use a lawnmower and send text messages, and that he was able to visually see enough to drive, read, watch television and perform various household tasks. (R. 31.)

Taking the above evidence into account, the ALJ concluded that Plaintiff's combination of obesity and right shoulder disorder supported the RFC's postural limitations in climbing, balancing, stooping, etc., and that the right shoulder disorder also limited Plaintiff's ability to lift overhead and push or pull with his right extremity. (*Id*.) Plaintiff's right shoulder injury and related symptoms also impacted the ALJ's decision to limit Plaintiff to no more than frequent lifting of 10 pounds and occasional lifting of 20 pounds as well as only frequent reaching overhead, pushing, or pulling to avoid further pain to his right shoulder; the limitations also considered Plaintiff's testimony about tremors and noted that he admitted he could perform fine manipulation. (*Id.*) The ALJ pointed to Plaintiff's admission that he was able to walk for a mile as justification for omitting any limitation on walking, standing, or sitting in the RFC. (R. 31-32.)

With respect to Plaintiff's mental health limitation, the ALJ explained that her RFC accounted for his moderate limitations in interacting with others and concentration, persistence and pace by limiting him to simple routine tasks that did not vary from day to day, had no strict quota, and involved no public contact and only limited contact with coworkers. (R. 32.) The ALJ explained that the RFC also accounted for Plaintiff's need to take insulin injections but noted that while Plaintiff stated his concentration was affected by low blood sugar, the evidence showed that Plaintiff had been able to work at the substantial gainful level despite problems with his blood

12

sugar since April 1985, and that Plaintiff admitted he treated his low blood sugar with a piece of food or glucose tablet. (*Id.*)

IV. Analysis

An ALJ's decision will be affirmed if it is supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, – U.S. –, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. The Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination. Rather, this court asks whether the ALJ's decision reflects an adequate logical bridge from the evidence to the conclusions." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (internal citations and quotations omitted).

Plaintiff argues that the ALJ erred by (1) failing to evaluate the side effects of Plaintiff's medication; and (2) evaluating the opinion evidence improperly. We will address each issue in turn.

    A.     **The ALJ Supported Her Evaluation of Plaintiff's Medication Side-Effects with Substantial Evidence**

As Plaintiff noted, the regulations require that in evaluating the intensity, persistence, and limiting effects of an individual's symptoms, an ALJ should consider the "side effects of any medication an individual takes or has taken to alleviate pain or other symptoms." SSR 16-3p, at *8; *see also* CFR 404.1529(c)(3)(iv); *Vernice S-P v. Kijakazi,* No. 21 C 1214, 2022 WL 16553038, at *10 (N.D. Ill. Oct. 31, 2022). This the ALJ did, supporting with substantial evidence her finding that Plaintiff's hand tremors, which were determined to be a side effect of his medication Rexulti, were fully addressed in her RFC. Specifically, the ALJ noted that Plaintiff himself testified that he was able to engage in fine manipulation and that she reduced the amount of time Plaintiff would

13

be able to finger or reach not only in recognition of his shoulder injury but also to account for his tremors. The ALJ further acknowledged the many daily activities requiring fine motor skills that Plaintiff was able to perform, not to demonstrate that he was not disabled, but as a permissible factor in evaluating his credibility about the severity of his symptoms. In contrast, Plaintiff offers no evidence to support his contention that his hand tremors rendered him unable to work or even be unable to perform at the limited light RFC that the ALJ assigned.

Instead, Plaintiff's allegations of error amount to little more than his contention that the fact that he had hand tremors should have translated into a different RFC. But a symptom or diagnosis on its own does not equal a limitation; it is the Plaintiff's burden to demonstrate how he is unable to perform particular functions because of his impairment. *Megan G. v. Saul*, 19 C 5237, 2021 WL 2105038 at *9 (N.D. Ill., May 25, 2021), *citing Weaver v. Berryhill,* 746 F. App'x 574, 578-79 (7th Cir. 2018).[7] Moreover, the ALJ supported with substantial evidence her decision to give Dr. Rivers' opinion that Plaintiff could not engage in any fine motor skills or fingering little weight. As we explained above, Dr. Rivers' opinion is belied by Plaintiff's own admissions and ability to perform a number of fine motor skills, and the doctor did not point to any medical evidence beyond the mere existence of the tremors, to support his restrictions. Similarly, the ALJ did not have to provide greater limitations in the RFC on account of Dr. Rivers' single observation

---

[7] We find nothing inconsistent about the ALJ's decision to account for Plaintiff's tremors even though she did not find them to be a severe impairment. The ALJ found Plaintiff's tremors to be non-severe and the regulations require an ALJ to account for all medically determinable impairments despite their severity. S.S.R. 96–8p; *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). This is what the ALJ did in considering the medical evidence concerning Plaintiff's tremors. Further, while Plaintiff contends that the ALJ erred by determining that Plaintiff's tremors were not shown to have lasted for 12 months, the medical record first mentions tremors in January 2018 and they were linked to Plaintiff's medication in April 2018. The fact that Plaintiff began taking Rexulti, the medication possibly accounting for the tremors, in September 2016 does not establish that he had a problem with tremors then; Plaintiff himself testified that his tremors began in January 2018. And even if the ALJ was incorrect that Plaintiff's tremors had not lasted at least 12 months, the error was harmless because she provided other substantial evidence to support her treatment of Plaintiff's hand tremors in her RFC.

that Plaintiff experiences grogginess and fatigue that might limit his alertness. Again, it is *Plaintiff's* burden to show how a particular symptom or impairment affects his ability to work and he points to no evidence explaining how his grogginess affects his ability to work or how long he might be off-task or off work due to being tired.

Additionally, while Plaintiff contends that the ALJ should have obtained an updated medical review before she determined the significance of Plaintiff's tremors, we disagree. This is not a case in which the ALJ improperly played doctor in determining the significance (or not) of Plaintiff's tremors. Instead, she properly relied on the opinion of a neurologist that the tremors were a side effect of Plaintiff's medication and then considered all of the evidence that supported her determination that Plaintiff was able to work and frequently finger and engage in fine manipulation despite the tremors. There was no error.

### B. The ALJ's Treatment of the Medical Opinion was Supported with Substantial Evidence.

The ALJ discussed and assigned weight to at least 19 different medical source statements and opinions in the record and Plaintiff argues that the ALJ's treatment of several of them, from his treating internist and treating psychiatrist, was incorrect and warrants remand. We disagree. First, because Plaintiff filed his claim prior to March 27, 2017, we use the treating physician rule, which states that an ALJ must give controlling weight to a treating physician's opinion if it is: (1) supported by medical findings; and (2) consistent with substantial evidence in the record. *Zoch v. Saul,* 981 F.3d 597, 602 (7th Cir. 2020). If the ALJ concludes that a treating physician's opinion is not entitled to controlling weight, she must give "good reasons" for discounting the opinion, after considering factors such as the nature of the treatment relationship, the frequency of examination, the physician's specialty, the type of tests performed, and the reliability of the opinion. *See* 20 C.F.R. § 416.927(c).81 F.

15

Given this standard, the ALJ properly supported her determination to give Drs. Rivers and Gaonkar's opinions little weight because they were inconsistent with the treatment record as a whole and did not provide functional limitations based on Plaintiff's impairments. As we explain below, the ALJ provided specific reasons for discounting medical opinions that were untethered to or inconsistent with treatment records and Plaintiff's own testimony, and we will not reweigh her determination that the evidence as a whole supported the RFC she assigned.

First, Plaintiff argues that the ALJ did not support with substantial evidence her decision to give little weight to Dr. Goankar's April 2016 opinion, which reported that Plaintiff mostly stayed at home due to anxiety and could not start his day because of depression. But as the ALJ explained, this opinion did not refer to Agency criteria for determining disability and did not provide for specific functional limitations. Instead, as the Commissioner notes, Dr. Gaonkar was merely answering a question on a short-term disability form that asked him to state what his patient reported as his activities in a typical day. It was not a medical opinion about Plaintiff's abilities. *Shannon v. Saul,* No. 18 C 7074, 2020 WL 264522 at *5 (N.D. Ill. January 17, 2020) (statement Plaintiff made to his doctor did not become a medical finding merely by fact of doctor repeating it.) Dr. Goankar did not opine that Plaintiff was unable to work or provide specific reasons or medical evidence for particular limitations based on Plaintiff's depression or anxiety, so the ALJ's decision to give this opinion little weight was not in error.

The ALJ also supported with substantial evidence her decision to give little weight to Dr. Gaonkar's March 2018 opinion because it did not refer to specific treatment records and was inconsistent with limitations documented in the record at exhibit 25-F, which is a series of short progress notes from Plaintiff's visits to Dr. Goankar between May and October 2017. Plaintiff says that comments in that exhibit, which diagnose Plaintiff with severe depression and say that

16

he has difficulty focusing and other symptoms of depression, are not inconsistent with Dr. Gaonkar's opinion that Plaintiff had marked limitations in all areas of mental health functioning. But in this same exhibit are also reports that Plaintiff was doing "fairly well" on his medications. Moreover, the ALJ points to numerous other medical records that demonstrate Plaintiff's ability to manage his daily life and support a finding that his mental health impairments were less than marked, including a number of records that report improvement with medication and Plaintiff's increased participation in activities such as gardening, going out for meals, driving his child places and improving his relationship with his father. The ALJ also spends considerable time explaining why the evidence supports a finding that Plaintiff has no more than moderate limitations with the Paragraph B criteria, including that he traveled to a Florida amusement park, goes shopping and out to eat as reasons why he has only moderate difficulties interacting with others, and that he's able to maintain a schedule for caring for his child and is able to read, compose and send texts, handle funds, go out alone without getting lost, and drive as reasons he has no more than moderate limitations in concentration, persistence and maintaining pace. We will not reweigh the evidence the ALJ used to decide that Dr. Gaonkar's opinion was entitled to little decisional weight.[8]

The ALJ also supported with substantial evidence her decision to give little weight to Dr. Rivers' February 2018 opinion that Plaintiff needed numerous unscheduled breaks to care for his diabetes and was limited in his ability to finger because of his tremors. Specifically, the ALJ explained that the opinion did not explain or refer to any medical records to support the limitations cited and as we explain above, she pointed to substantial evidence that Plaintiff was able to perform fine motor work despite his tremors and that he had successfully worked at the substantial gainful

---

[8] Plaintiff does not argue that the ALJ erred in giving the Agency doctors' opinions some weight and her decision to add additional restrictions to the RFC to account for Plaintiff's obesity and right arm disorder, and thus we do not need to analyze that determination.

level since 1985 despite his asserted need to manage his blood sugar numerous times per day. Similarly, the ALJ supported her determination to give little weight to Dr. Rivers' March 2018 opinion because she noted that although the lifting limitations were consistent with the RFC, it did not contain any limitations for Plaintiff's alleged vision disorder (and was belied by the fact that Plaintiff was able to drive, read, and watch television), failed to describe functional limitations related to Plaintiff's anxiety, and failed to describe the actual impact of Plaintiff's tremors on his fine dexterity or how he was nonetheless able to drive, operate machinery such as a lawn mower, use utensils, and text. In sum, the ALJ adequately supported her RFC determination with specific explanations for each assigned limitation and explained why she did not credit Plaintiff's contentions that he was disabled.

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiff's motion to remand (D.E. 12) and grants the Commissioner's motion to affirm (D.E. 20).

**ENTER:**

  
**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: November 28, 2022**